MESTA MACHINE CO., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 2841.   Promulgated June 11, 1928.

*W. A. Seifert, Esq.*, and *W. M. Smith, C. P. A.*, for the petitioner.
*A. R. Marrs, Esq.*, for the respondent.

528

OPINION.

MORRIS: The first assignment of error relates to the inclusion in income for the taxable year of the income from the B ship shaft contracts. Petitioner contends that its practice has been to report income from contracts on a "completed contract basis" and therefore these contracts here under consideration not having been completed in 1920, the income therefrom should not be included in gross income in that year. It contends that the contracts were not completed in 1920 because: (1) A considerable amount of work in connection with the contract was not completed until 1923, (2) the cost of work performed under said contract could not be determined until all work had been completed in 1923, (3) article 5 of supplemental agreement of June 10, 1920, required petitioner to keep its books of account open with respect to these "B" shaftings subject to audit until June 10, 1922, and that therefore the amount so received under the contract was subject to further adjustment, (4) the sovereign entity having kept its contract open for two years, the respondent can not consider it closed for income-tax purposes, (5) the petitioner had a claim against the Shipping Board on account of said contract which was not finally determined until 1923.

Section 213 of the Revenue Act of 1918 provides:

That for the purposes of this title (except as otherwise provided in section 233) the term "gross income"—

(a) Includes gains, profits * * *. The amount of all such items shall be included in the gross income for the taxable year in which received by the taxpayer, unless, under methods of accounting permitted under subdivision (b) of section 212, any such amounts are to be properly accounted for as of a different period; * * *.

Section 212 (b) of the same Act provides:

The net income shall be computed upon the basis of the taxpayer's annual accounting period (fiscal year or calendar year, as the case may be) in accordance with the method of accounting regularly employed in keeping the books of such taxpayer; but if no such method of accounting has been so employed, or if the method employed does not clearly reflect the income, the computation shall be made upon such basis and in such manner as in the opinion of the Commissioner does clearly reflect the income. * * *

Article 36 of Regulations 45 reads in part as follows:

Long-term contracts—Persons engaged in contracting operations, who have uncompleted contracts, in some cases perhaps running for periods of several

years, will be allowed to prepare their returns so that the gross income will be arrived at on the basis of completed work; that is, on jobs which have been finally completed any and all moneys received in payment will be returned as income for the year in which the work was completed. If the gross income is arrived at by this method, the deduction from such gross income should include and be limited to the expenditures made on account of such completed contracts. * * *

There is no dispute with respect to the petitioner's right to invoke the provisions of article 36 and report its income on a completed-contract basis; therefore the question is whether the income from the B ship shaft contract should be taken up for 1920 or a subsequent year on the completed-contract basis. We must determine from the contract and from the acts of the parties thereunder whether the contract was completed within the taxable year 1920.

The testimony shows that the petitioner completed and shipped the 35 B ship shafts, the contracts for which had not been canceled—two in 1918; 24 in 1919; and 9 in 1920. Furthermore, that the final shipment of shafts was made in July, 1920. Petitioner received the following sums representing the total payment on account of the 35 completed shafts:

| | |
|---|---|
| 1918 | $91, 929. 70 |
| 1919 | 1, 103, 156. 40 |
| 1920 | 413, 683. 65 |
| Total | 1, 608, 769. 75 |

It is clear therefore, that the purpose which moved the parties to contract, that is, the performance of work on the one hand, and the payment of money on the other, was totally completed in 1920. Counsel for the petitioner argues that the cost of rearranging its plant, which was not completed until 1923, was a part of the cost of this contract in question, and that because of the petitioner's inability to determine the cost of such rearrangement until the work was completed in 1923, the work under the contract was not completed until that time. We can not agree with petitioner's counsel for the reason that he is injecting collateral matters to substantiate the fact that the contract itself was not completed in 1920. Assuming that these charges should have been made against this contract, it does not appear from the testimony that there was any concerted effort made by the petitioner to complete its plans of rearrangement within any reasonable time. In fact it appears that these changes were being made as they were absolutely necessary to produce commercial work efficiently. To hold that the rearrangement should be completed before the income derived from such a contract should be reported would enable a taxpayer to postpone indefinitely the returning of income which has actually been received, which result, in our

opinion, is inconsistent with the theory of the tax laws. We have already held, however, that while such charges may have been occasioned by war contracts they do not appertain thereto, but rather to the production of future income. *Wallace Barnes Co.*, 10 B. T. A. 1304.

Article 5 of the supplemental agreement of June 10, 1920, does not in our opinion prevent this contract from being completed according to its terms in 1920. We concede that there may be necessity for some adjustment under the article referred to, but we can not agree with the contention that the contract thereby becomes incomplete and that the income therefrom should not be reported until after the time when the Government's right to make an audit was barred by article 5 above. To allow this argument to prevail we might, with equal force, assume that no contract is completed until the statute of limitations with respect to contracts has expired. The contract with the United States Shipping Board did not require the petitioner to keep the " contract open," it simply provided—which was the common practice in all Government contracts—that the Government should be permitted to audit the petitioner's books at any time within two years for the purpose of determining whether or not the provisions of the contract had been complied with. If they had, there was no possibility of an adjustment after audit.

While the facts in *Appeal of Uvalde Co.*, 1 B. T. A. 932, are not identical with the facts in the petitioner's case, the same general considerations are involved. The petitioner in that case attempted to withhold from gross income in the taxable year certain estimated sums required to fulfill a maintenance provision in the contract extending over a period of years. The Board said in that case " the maintenance provision may have been and was embodied in the contracts for the construction, but it was a separate and collateral undertaking based upon a contingency. Any taxpayer suspending business at the end of any taxable year and having at that time future collateral undertakings, might possibly find it necessary to expend a portion of the income received in the prior year in fulfilling obligations in connection with transactions which produced said income if occasion therefor should arise." But the Board says further " this does not entitle a taxpayer to withhold from taxable income, in addition to all expenses paid .or incurred within the taxable year, a liberal portion of the income because he may possibly be called upon to expend sums to make good guaranties entered into respecting work completed and for which he received full compensation within the taxable year."

As has been stated the right of the petitioner to compute its taxes on the long term contract basis has not been questioned. Article 36

of Regulations 45 quoted above permits the taxpayer to report gross income on the basis of completed work, which article says " that all moneys received in payment will be returned as income for the year in which the work was completed." That sentence unquestionably relates to the performance of the work specified in the contract. Finding as we do that the ship shafts provided for in the contract in question had been completed in 1920 and that payment had been received therefor, we must hold that the contract was completed in 1920 and that the income therefrom should be reported for that year.

The second assignment of error relates to the respondent's method of allocating the net income of the petitioner for the taxable year 1920 as between Government and commercial sales. There is no dispute with respect to the amount of net income for the taxable year; both petitioner (assuming that the income from the ship shaft contract is taxable income for 1920) and respondent having determined it to be $1,509,000.15. In making the allocation between Government and commercial income, the respondent found net income from commercial sales of $353,704.88; net income from Government sales of $1,155,295.27; total net income $1,509,000.15. The petitioner on the other hand now computes net income from commercial sales, $959,912.82; net income from Government sales, $549,087.33; total net income, $1,509,000.15. It will be seen from the computation of net income in the findings of fact as made by the respondent that the total sales used for that computation amounted to $8,423,929.55 allocated $6,496,475.76 to commercial sales and $1,927,453.79 to Government sales. The figure of total sales as found by the respondent does not include any portion of the amounts received by the petitioner in payment of 35 B ship shafts which were completed and delivered, nor does it include the amount received in settlement under a supplemental agreement between the United States Shipping Board and the petitioner dated June 10, 1920. The respondent then determined the percentage of commercial and Government sales to total sales and by applying those percentages to total manufacturing cost of $8,048,641.45 (excluding all costs in connection with B shafts) he found cost of manufacturing applicable to commercial sales, $6,207,-031.80, and as applicable to Government sales $1,841,609.65, arriving at a profit from commercial sales of $289,443.96 and income from Government sales of $85,844.14. The respondent then added to income from commercial sales miscellaneous income in the amount of $64,260.92 making a total income from commercial sales of $353,-704.88. He then added to the income from Government sales $251,600.07 net amount received under supplemental agreement of June 10, 1920, also $817,851.06 alleged to be net income from the 35

B ship shafts, making total net income from Government sales of $1,155,295.27.

The petitioner contends that there should be added to the gross sales of $8,423,929.55 the gross sum of $450,000 received under the cancellation agreement of June 10, 1920, and also the gross income from 35 B ship shafts completed in the amount of $1,608,769.75, thereby increasing the total gross sales to $10,482,699.30, making the allocation of gross sales $6,496,475.76 to commercial sales and $3,986,-223.54 to Government sales. The petitioner further contends that the percentages of commercial and Government sales to the total sales should then be determined and applied to the total cost of sales in determining the net income from these two classes of sales.

Section 301 (a) (c) of the Revenue Act of 1918 provides as follows:

(a) That in lieu of the tax imposed by Title II of the Revenue Act of 1917, but in addition to the other taxes imposed by this Act, there shall be levied, collected, and paid for the taxable year 1918 upon the net income of every corporation a tax equal to the sum of the following:

\*      \*      \*      \*      \*      \*      \*

(c) For the taxable year 1919 and each taxable year thereafter there shall be levied, collected, and paid upon the net income of every corporation which derives in such year a net income of more than $10,000 from any Government contract or contracts made between April 6, 1917, and November 11, 1918, both dates inclusive, a tax equal to the sum of the following:

(1) Such a portion of a tax computed at the rates specified in subdivision (a) as the part of the net income attributable to such Government contract or contracts bears to the entire net income. In computing such tax the excess-profits credit and the war-profits credit applicable to the taxable year shall be used;

(2) Such a portion of a tax computed at the rates specified in subdivision (b) as the part of the net income not attributable to such Government contract or contracts bears to the entire net income.

For the purpose of determining the part of the net income attributable to such Government contract or contracts, the proper apportionment and allocation of the deductions with respect to gross income derived from such Government contract or contracts and from other sources, respectively, shall be determined under rules and regulations prescribed by the Commissioner with the approval of the Secretary.

Article 715 of Regulations 45 provides:

Whenever it is necessary to determine the portion of the net income derived from or attributable to a particular source, the corporation shall allocate to the gross income derived from such source, and to the gross income derived from each other source, the expenses, losses, and other deductions properly appertaining thereto, and shall apply any general expenses, losses and deductions (which can not properly be otherwise apportioned) ratably to the gross income from all sources. The gross income derived from a particular source, less the deductions properly appertaining thereto and less its proportion of any general deductions, shall be the net income derived from such source. The corporation shall submit with its return a statement fully explaining the manner in which such expenses, losses, and deductions were allocated or distributed.

The testimony offered by the petitioner with respect to the inaccuracy of its cost records for the years 1918, 1919, and 1920, also with respect to the impossibility of properly and accurately distributing costs and applying them to particular orders, is most convincing. The testimony of petitioner's witnesses to the effect that the sum of $817,851.06 did not represent net profit from 35 B ship shafts which were completed and delivered, but did actually represent gross manufacturing profit, was undisputed. There is sufficient testimony in the record to convince us that the income from B ship shafts as determined by the respondent is grossly incorrect. We are also convinced because of the condition of the cost records during the taxable year and the years during which this B ship shaft contract was being executed that the costs and expenses properly appertaining to these two classes of income can not be definitely determined.

For 1919 it appears that the respondent apportioned the costs and other expenses, not definitely allocable, on the basis of the percentage of each class of sales to the total sales. In fact that is the method partially pursued by him for the taxable year. Under the circumstances of this case in which the only known factors are the total sales of each class and the net income of both, it is our opinion that the proper method of arriving at an allocation, is to include in the gross sales the sums received under the B ship shaft contract and supplemental contract of June 10, 1920, and to allocate the total costs to the Government and commercial work on the basis of the percentage which each class of sales bears to the total gross sales.

The third assignment of error relates to the refusal of the respondent to determine petitioner's excess-profits tax for the year 1920 under the provisions of sections 327 and 328 of the Revenue Act of 1918. Petitioner contends that it has abnormal conditions affecting both income and invested capital within the taxable year 1920 and that its taxes for that year should be computed under the provisions of section 328 of the Revenue Act of 1918. The respondent, on the other hand, alleges that the petitioner has not suffered any exceptional hardship with reference to its profits taxes so as to entitle it to relief under the provisions of the Act aforesaid. Section 327 of the Revenue Act of 1918 provides:

SEC. 327. That in the following cases the tax shall be determined as provided in section 328:

\* \* \* \* \* \* \*

(d) Where upon application by the corporation the Commissioner finds and so declares of record that the tax if determined without benefit of this section would, owing to abnormal conditions affecting the capital or income of the corporation, work upon the corporation an exceptional hardship evidenced by gross disproportion between the tax computed without benefit of this section and the tax computed by reference to the representative corporations specified in

542

section 328. This subdivision shall not apply to any case (1) in which the tax (computed without benefit of this section) is high merely because the corporation earned within the taxable year a high rate of profit upon a normal invested capital, nor (2) in which 50 per centum or more of the gross income of the corporation for the taxable year (computed under section 233 of Title II) consists of gains, profits, commissions, or other income, derived on a cost-plus basis from a Government contract or contracts made between April 6, 1917, and November 11, 1918, both dates inclusive.

Section 328 (*a*) of the same act provides:

In the cases specified in section 327 the tax shall be the amount which bears the same ratio to the net income of the taxpayer (in excess of the specific exemption of $3,000) for the taxable year, as the average tax of representative corporations engaged in a like or similar trade or business, bears to their average net income (in excess of the specific exemption of $3,000) for such year. In the case of a foreign corporation the tax shall be computed without deducting the specific exemption of $3,000 either for the taxpayer or the representative corporations.

In computing the tax under this section the Commissioner shall compare the taxpayer only with representative corporations whose invested capital can be satisfactorily determined under section 326 and which are, as nearly as may be, similarly circumstanced with respect to gross income, net income, profits per unit of business transacted and capital employed, the amount and rate of war profits or excess profits, and all other relevant facts and circumstances.

Petitioner was organized in 1898, at which time there was a consolidation between the Leechburg Foundry & Machine Co. and Robinson-Rea Mfg. Co. Both of these companies had been engaged in the same business as that of the petitioner. No testimony was offered with respect to the nature of the consolidation or the condition of these companies at that time. The abnormalities upon which the petitioner relies are (1) the use of Government facilities without cost to the petitioner; (2) machinery and equipment manufactured by petitioner for its own use, the values of which are not fully reflected in the books of account; (3) ownership of patterns and designs not appearing in its books of account for the year in question; (4) ownership of patents and licenses, not appearing in the books of account.

We do not consider that the petitioner has adduced sufficient evidence with respect to the Government facilities used by it and with respect to machinery manufactured for its own use to warrant the Board in holding that these facts in and of themselves constitute a sufficient abnormality to bring the case within the provisions of section 327 of the Revenue Act of 1918. The petitioner has shown, however, that it owns 16,709 patterns and equally as many designs or drawings, and that these patterns cost in the neighborhood of $2,000,-000; also that the designs had as great if not a greater value than the patterns. The testimony shows that the petitioner could not possibly carry on its business without the use of patterns and designs, because without a design or drawing of some description a pattern can not be

made and without a pattern it would be impossible to successfully manufacture the company's product. The fact that the company's patents and licenses to manufacture under patents owned by others were of great value and were responsible for considerable of its income in 1920 has been demonstrated in a most satisfactory and most convincing manner. The evidence shows that gross sales of articles patented for the year 1920 were $1,336,139.94 and that the net profit from these sales amounted to $196,071.65. Furthermore, that the patented articles represented 20.57 per cent of the total commercial sales.

In our opinion the petitioner has presented sufficient evidence as to the ownership of valuable property in the nature of patterns and designs and patents which value is not reflected in its books of account, and can not be correctly determined, to warrant a finding that the existence thereof created abnormal conditions affecting its capital and income which brings the petitioner within section 327 of the act and therefore its excess-profits tax should be computed under section 328.

Reviewed by the Board.

*Judgment will be entered under Rule 62(c).*